1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| BUNGIE, INC., a Delaware corporation,<br><br>               Plaintiff,<br><br>    v.<br><br>MIHAI CLAUDIU-FLORENTIN, an individual, d/b/a VETERANCHEATS.COM; DOE 1 a/k/a BLAZE, an individual; DOE 2, a/k/a KNORR, an individual; DOE 3 a/k/a JOHN MCBERG, an individual, and DOES 4-10,<br><br>               Defendants. | No. 2:21-cv-01114<br><br>**[PROPOSED] ORDER GRANTING MOTION FOR DEFAULT JUDGMENT** |

19
20
21
22
23
24
25
26

      This matter having come before the Court upon Plaintiff Bungie, Inc.'s ("Bungie") Motion for Default Judgment against Defendant Mihai Claudiu-Florentin ("Defendant" or "Claudiu-Florentin"), and the Court having considered the Motion, the declarations in support, and the pleadings and filings herein, and good cause having been shown, the Court hereby GRANTS the Motion, ORDERS as follows, and directs the Clerk to enter Judgment in conformity with this Order, including entering a monetary judgment in the amount of $12,059,912.98 against Claudiu-Florentin, a permanent injunction, and such other relief as explained below:

**FINDINGS OF FACT**

Bungie is the developer and publisher of the critically-acclaimed video game *Destiny 2*, a shared-world MMO shooter game. *Destiny 2* operates on a "free-to-play" model under which the base game and experience are provided without charge, and anyone with the hardware and inclination can download the game and play it. If players enjoy the game, they can become customers; Bungie offers for sale various expansions and packs of content that add story missions and campaigns, new weapons and items, and a wide variety of cosmetic and aesthetic enhancements that players can obtain using "silver," an in-game currency. The success of Bungie's business therefore depends upon providing a high-quality player experience, which in turn creates community goodwill. The better the game, the more fun it is to play, the more players become paying customers.

Bungie has heavily invested in the development of new content for *Destiny 2*— both free and commercial, such as expansion packs. Cheat software imperils these investments as well as Bungie's entire free-to-play business model. When *Destiny 2*'s competitive modes are saturated with cheaters, the game becomes unfair—cheaters capture in-game rewards from honest players with greater skill, and honest players stop having fun and stop spending money and participating in the game's community. This harms Bungie's reputation and its bottom line.

Bungie devotes significant resources to protecting the quality of its player experience. To play *Destiny 2*, players must first agree to the Limited Software License Agreement (the "LSLA"); it is impossible to play the game and use the *Destiny 2* software without agreeing to the LSLA's terms. The LSLA contains provisions acknowledging Bungie's intellectual property rights and prohibiting cheating, hacking, and modifying the game.

Mr. Claudiu-Florentin, a resident of Romania, makes a living through the distribution of illegal cheat software. Doing business as VeteranCheats.com, Mr. Claudiu-Florentin, or his associates, developed, marketed, distributed, and trafficked in cheat software for *Destiny 2* (the "Cheats"), both individually and collectively with the other Defendants. Expedited discovery revealed that Mr. Claudiu-Florentin controlled the content of the website VeteranCheats.com (the "Website") through which Defendants distributed those cheating software products. Claudiu-Florentin's advertising and promotion of the Cheats on the Website incorporated copyrighted audiovisual content from *Destiny 2*.

Users could purchase a "day key" or a "month key" for the Euro equivalent of approximately $13 to $19 for a day and $105 to $164 for a month. According to data from third-party payment processor Stripe, Inc. ("Stripe"), there have been at least 5,848 separate transactions for either a *Destiny 2* Cheat or a premium cheat product containing *Destiny 2* as an option. The Cheats work by circumventing Bungie's technological controls and injecting cheat software into the game memory for *Destiny 2*. That code provides purchasers of the Cheats with an array of features to which a non-cheating user does not have access. In addition to altering play for those purchasing the Cheats, these features alter the display and game experience for other players. The cheat software distributed through the Website also features "HWID Spoofers." These features help cheaters alter information in the anti-cheat systems Bungie uses to identify and block access to hardware that has been banned for cheating or other violations of the LSLA, thus circumventing technical measures specifically designed to prevent banned users from accessing Bungie's services for *Destiny 2*. Claudiu-Florentin has expressly stated that the Cheats on the Website are designed to evade detection by Bungie's anti-cheat technology.

1

**CONCLUSIONS OF LAW**

2          This Court has authority to enter default judgment against Claudiu-Florentin

3   pursuant to Federal Rule of Civil Procedure 55. *See* Fed. R. Civ. P. 55; LCR 55. In

4   exercising this authority, the Court must ensure that it has both personal and subject

5   matter jurisdiction. *Padded Spaces LLC v. Weiss*, No. C21-0751JLR, 2022 WL

6   2905887, at *2 (W.D. Wash. July 22, 2022) (citing *In re Tuli*, 172 F.3d 707, 712 (9th

7   Cir. 1999)). Then, the Court must assess the seven *Eitel* factors:

8               (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's
               substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at
9               stake in the action; (5) the possibility of a dispute concerning material facts;
               (6) whether the default was due to excusable neglect, and (7) the strong policy
10              underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

11  *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

12          Here, the Court has subject matter jurisdiction and personal jurisdiction. In its

13  Amended Complaint, Bungie asserted claims against Claudiu-Florentin under the

14  Copyright Act, 17 U.S.C. § 501 *et seq.*, and the Digital Millennium Copyright Act,

15  codified in part at 17 U.S.C. § 1201(a). Dkt. 18 at 14-18 ¶¶ 53-80. The Court has federal

16  question jurisdiction over civil actions arising under these federal statutes. *See* 28

17  U.S.C. § 1331. The Court also has supplemental jurisdiction over Bungie's state law

18  claims for breach of contract, tortious interference, and violation of the Washington

19  Consumer Protection *See* 28 U.S.C. 1367(a); *see also* Dkt. 18 at 18-21 ¶¶ 81-102.

20          The Court has personal jurisdiction over Claudiu-Florentin. Claudiu-Florentin

21  agreed to the LSLA and accepted its terms as part of the process of downloading,

22  installing, and playing *Destiny 2*, as every user is required to do. Dkt. 18 at 3 ¶ 13, 13

23  ¶ 46. The LSLA contains a forum selection clause under which those who accept the

24  agreement "consent to the exclusive jurisdiction of the state and federal courts in King

25  County, Washington." Dkt. 18 at 3 ¶ 13. That agreement is sufficient to give the Court

26  personal jurisdiction over Claudiu-Florentin. *See Facebook, Inc. v. ILikeAd Media Int'l*

*Co.*, No. 19-CV-07971-SK, 2022 WL 2289064, at *2 (N.D. Cal. Feb. 1, 2022), *report and recommendation adopted as modified*, No. 19-CV-07971-JST, 2022 WL 2289058 (N.D. Cal. Mar. 15, 2022) (citing *Holland Am. Line Inc. v. Wärtsilä N. Am. Inc.*, 485 F.3d 450, 458 (9th Cir. 2007)). The Court also has personal jurisdiction over Claudiu-Florentin under Washington's long-arm statute, which provides for jurisdiction over "any cause of action arising from . . . [t]he commission of a tortious act within this state" by "[a]ny person, whether or not a citizen or resident of this state." RCW 4.28.185(1), (1)(b).[1]

### A.    The *Eitel* Factors Favor Entry of Default Judgment.

#### 1.    The First, Sixth, and Seventh *Eitel* Factors Favor Default Judgment Because Claudiu-Florentin Has Consciously Decided Not to Appear.

Each of the first, sixth, and seventh *Eitel* factors favors entry of default judgment. Taking the sixth *Eitel* factor first, the evidence of record establishes that Claudiu-Florentin received actual notice of this litigation at least as early as March 29, 2022 (and appeared in a Romanian court on September 2, 2022, to accept service of process a second time), yet he did not appear in this case. That being the case, there is no evidence of excusable neglect. *See Padded Spaces*, 2022 WL 2905887, at *3 (weighing sixth *Eitel* factor in favor of default judgment in the absence of such evidence).

---

[1] The Court served process on Claudiu-Florentin by mail, Dkts. 21-22, pursuant to Federal Rule of Civil Procedure 4(f)(2)(C)(ii), and Claudiu-Florentin acknowledged receipt on March 29, 2022. Dkt. 26. Bungie also served Claudio-Florentin via the Romanian Central Authority, in accordance with Articles 3 through 6 of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention") and Federal Rule of Civil Procedure 4(f)(1) by transmitting the documents required for service of process to the Romanian Central Authority. Claudiu-Florentin has acknowledged receipt. The Court entered default against Claudiu-Florentin on July 14, 2022. *See* Dkt. 29.

As to the first *Eitel* factor, Claudiu-Florentin is deemed to have admitted, by his default, the truth of Bungie's allegations concerning the financial and reputational harm Bungie has suffered as a result of his unlawful conduct. Thus, Bungie would be the party to suffer prejudice if the Court declined to enter default judgment, as Bungie would have no remedy against Claudiu-Florentin and no means to prevent him from inflicting further harm. *See Amazon Content Servs. LLC v. Kiss Libr.*, No. C20-1048 MJP, 2021 WL 5998412, at *3 (W.D. Wash. Dec. 17, 2021) ("Defendants have failed to appear or participate in this litigation. Plaintiffs face prejudice by not being able to obtain complete relief on their claims . . . ."). Finally, the seventh *Eitel* factor also favors entry of default judgment. The usual preference to decide cases on the merits simply does not apply, as Claudiu-Florentin's "failure to answer [Bungie's] complaint makes a decision on the merits impractical, if not impossible." *Padded Spaces*, 2022 WL 2905887, at *3 (citing *PepsiCo., Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002)). In sum, the first, sixth, and seventh *Eitel* factors weigh in Bungie's favor.

> **2.     The Second and Third *Eitel* Factors Favor Bungie Because Bungie's Amended Complaint and Supporting Evidence Establish Claudiu-Florentin's Liability.**

The second and third *Eitel* factors are "often analyzed together." *Padded Spaces*, 2022 WL 2905887, at *3 (quoting *Curtis v. Illumination Arts, Inc.*, 33 F. Supp. 3d 1200, 1211 (W.D. Wash. 2014)). In assessing these factors, the Court must examine whether Bungie pleaded facts sufficient to establish and succeed on its claims. *Id.*; *see PepsiCo*, 238 F. Supp. 2d at 1175 ("The Ninth Circuit has suggested that these two factors require that a plaintiff 'state a claim on which the [plaintiff] may recover.'") (citations omitted). As shown below, this Motion is amply supported as to each of Bungie's claims by the well-pleaded allegations in the Amended Complaint (Dkt. 18), the sworn declaration of Bungie's counsel, and supporting documentary evidence.

### a.     Bungie Has Established Claudiu-Florentin's Liability for Copyright Infringement.

To prevail on its claim of copyright infringement, Bungie must establish that: (1) it owns copyrights in *Destiny 2*; and (2) Claudiu-Florentin violated at least one of the exclusive rights enumerated in 17 U.S.C. § 106. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) (citations omitted).  Bungie has established these elements here.

Bungie has copyright registrations for *Destiny 2* and *Destiny 2*: Beyond Light, both as literary works (consisting of computer code) and audiovisual works. Dkt. 18-1 through 18-4; Barker Decl. ¶ 3, Ex. 1. Because those registrations issued "within five years after first publication of the work," they "constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Bungie's well-pleaded allegations and the evidence of record establish that Claudiu-Florentin and the other Defendants violated Bungie's exclusive rights by developing and offering the Cheats for sale on the Website. As "[c]opyright is a strict liability tort," and "all individuals who participate are jointly and severally liable." *Urb. Accessories, Inc. v. Iron Age Design & Imp., LLC*, No. C14-1529JLR, 2015 WL 1510027, at *4 (W.D. Wash. Apr. 1, 2015) (citation omitted).

Claudiu-Florentin infringed Bungie's copyrights in multiple ways. First, during the process of developing the Cheats, one or more of Claudiu-Florentin and the other Defendants fraudulently gained access to the *Destiny 2* code by downloading, installing, and playing it without any intention of abiding by the terms of the LSLA. *See Blizzard Ent., Inc. v. Bossland GmbH*, No. 16-cv-1236-DOC, 2017 WL 7806600, at *4 (C.D. Cal. Mar. 31, 2017) (finding Blizzard properly alleged direct infringement where the defendant fraudulently gained access to Blizzard's game software). Claudiu-Florentin and the other Defendants then developed cheat software that incorporates *Destiny 2*'s code structures and graphics, constituting unauthorized reproduction. *See* 17 U.S.C.

§ 106(1); *Bungie, Inc. v. Aimjunkies.com*, No. C21-811 TSZ, 2022 WL 2391705, at *2 (W.D. Wash. July 1, 2022) (cheat software that "necessarily copied" code corresponding to data structures likely infringed).

In addition, Claudiu-Florentin and the other Defendants adapted *Destiny 2* by creating or distributing cheat software to alter the execution of the game software, thereby altering the content of *Destiny 2* when played, including by annotating Bungie's copyrighted audiovisual displays with overlays. Adding dynamic screen overlays to Bungie's copyrighted *Destiny 2* audiovisual work creates an unauthorized derivative work under 17 U.S.C. § 106(2). *See Aimjunkies.com*, 2022 WL 2391705, at *2 n.4 (granting preliminary injunction where, *inter alia*, Bungie alleged "[t]he Defendants' ESP feature . . . modifies the audiovisual display of Destiny 2 'by displaying a distinct box around the other players, displaying the players' names, and their distance from the cheat user'" (citation omitted)); *Take-Two Interactive Software, Inc. v. Zipperer*, No. 18 Civ. 2608 (LLS), 2018 WL 4347796, at *8 (S.D.N.Y. Aug. 16, 2018) (finding cheat software that created "alternative version" of video game "with added elements" sufficient to support finding of likely success on the merits).

Finally, Claudiu-Florentin promoted the Cheats on the Website by featuring audiovisual sequences from *Destiny 2*, then used the Website to distribute and offer to distribute copies of the Cheats to paying customers, violating Bungie's exclusive rights of public performance and public distribution because Claudiu-Florentin "communicate[d] a performance . . . of the work . . . to the public" by means of the internet, where "members of the public capable of receiving the performance" could "receive it in the same place or in separate places and at the same time or at different times." *See* 17 U.S.C. § 101 (defining "publicly"); *see also* 17 U.S.C. § 106(3) (giving owners of copyright the exclusive right "to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership"); *Nexon Am., Inc. v. S.H.*, No. CV

10-9689, 2011 WL 13217951, at *4 (C.D. Cal. Dec. 13, 2011) (finding the defendant infringed the plaintiff's distribution right by uploading a modified version of the plaintiff's video game software to a website, where it was downloaded by third parties).

Based on these facts, Bungie has alleged that Claudiu-Florentin acted willfully. Dkt. No. 18 at 15 ¶ 60. Factual allegations of willfulness are deemed admitted on default. *See Crim. Prods., Inc. v. Evans*, No. 16-CV-1647RAJ, 2018 WL 2397439, at *1 (W.D. Wash. Apr. 4, 2018) (deeming allegation of willfulness admitted on default); *FameFlynet, Inc. v. Feel the Piece, LLC*, No. CV 17-5406 FMO (GJSX), 2018 WL 4850383, at *3 (C.D. Cal. Feb. 21, 2018) ("A court may infer willfulness even where a defendant defaults."); *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 702 (9th Cir. 2008) ("[A]ll factual allegations in the complaint are deemed true, including the allegation of Poof's willful infringement."). Even if this were not the case, however, the record contains ample factual basis for a finding of willfulness here. *See, e.g.*, Dkt. 18 at 8 ¶ 38, 11-12 ¶ 43. In sum, Bungie has established Claudiu-Florentin's liability for willful copyright infringement.

### b.    Bungie Has Established Claudiu-Florentin's Liability for Circumvention of Technological Measures.

The second and third *Eitel* factors also favor entry of default judgment for Bungie's circumvention claims under 17 U.S.C. § 1201. Claudiu-Florentin and the other Defendants circumvented Bungie's anti-cheat measures designed to (a) prevent unauthorized access to the data in *Destiny 2*, including reading and writing to the data and making unauthorized copies, (b) monitor for and prevent unauthorized execution of software operations, and (c) monitor for and prevent manipulation of game functionality (*e.g.*, firing a weapon) to gain an unfair advantage. In normal operations, these measures effectively control unauthorized access to *Destiny 2*. Not only do the Cheats bypass these measures, but they also interfere with Bungie's ability to identify and block access

1   to hardware that has been banned for cheating. Knowing the Cheats would enable users

2   to bypass Bungie's anti-cheat measures, Claudiu-Florentin marketed the Cheats on the

3   Website and used Stripe to process payments.

4       These acts establish Claudiu-Florentin's liability for circumvention and

5   trafficking in violation of 17 U.S.C. §1201(a). Claudiu-Florentin "circumvent[ed] a

6   technological measure that effectively controls access to a work protected under [Title

7   17]"—*i.e.*, Bungie's copyrighted *Destiny 2* works—then "(1) traffic[ked] in (2) a

8   technology or part thereof (3) that is primarily designed, produced, or marketed for, or

9   has limited commercially significant use other than (4) circumventing a technological

10  measure (5) that effectively controls access (6) to a copyrighted work." *MDY Indus.*

11  *LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 953 (9th Cir. 2010). Bungie has established

12  Claudiu-Florentin's liability for circumvention under 17 U.S.C. § 1201(a).

13          **c.      Bungie Has Established Claudiu-Florentin's Liability for**
            **Breach of Contract and Tortious Interference with**
14          **Contractual Relations.**

15      The second and third *Eitel* factors also favor default judgment for Bungie's

16  claims for breach of contract and tortious interference with contractual relations. To

17  prove breach of contract, Bungie must establish the existence of a contract that imposes

18  a duty, a breach of that duty, and damages. *Myers v. State*, 152 Wash. App. 823, 826,

19  218 P.3d 241, 243 (Wash. Ct. App. 2009) (reciting elements of a breach of contract

20  claim). Bungie's Amended Complaint, which is well pleaded, alleges the existence of

21  an enforceable contract—the LSLA— which contains terms that Claudiu-Florentin and

22  the other Defendants were required to accept when they first downloaded and played

23  *Destiny 2*. Claudiu-Florentin unquestionably violated those terms.

24      Bungie also has established that Claudiu-Florentin tortiously interfered with

25  Bungie's contractual relations. Bungie's claim for tortious interference requires it to

26  show: (1) the existence of a valid contractual relationship; (2) Claudiu-Florentin's

knowledge of that relationship; (3) his intentional interference with that relationship by inducing or causing a breach; (4) Claudiu-Florentin's improper purpose or improper means; and (5) resulting damage to Bungie. *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 131 Wash. 2d 133, 157, 930 P.2d 288, 300 (Wash. 1997) (en banc). Each of those elements is satisfied here. The LSLA is a valid contract between Bungie and *Destiny 2* players. Having executed the LSLA, as he was required to do, Claudiu-Florentin was well aware of its terms, yet intentionally interfered with that Bungie's and its users' contractual relationships by supplying cheat software that he knew would hack and modify *Destiny 2*. His improper purpose was to profit from Bungie's intellectual property, and as shown above, his means were improper because they violated the Copyright Act. Finally, Claudiu-Florentin's actions damaged Bungie by requiring it to incur costs to defend against the Cheats. In sum, Bungie has established Claudiu-Florentin's liability for breach of contract and tortious interference with contractual relations under Washington law.

> **d.    Bungie Has Established Claudiu-Florentin's Liability for Violating the Washington Consumer Protection Act.**

Finally, the second and third *Eitel* factors favor default judgment for Bungie's claim under the Washington Consumer Protection Act ("WCPA"). To prevail in a private cause of action under the WCPA, Bungie must establish: "(1) [Claudiu-Florentin's] unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to [its] business or property, and (5) causation." Panag *v. Farmers Ins. Co. of Wash.*, 166 Wash. 2d 27, 37, 204 P.3d 885, 889 (Wash. 2009) (citation omitted).

Bungie has satisfied each of these elements. First, the development, use, and sale of cheat software deceives both Bungie and the gaming public, thus affecting the public interest. Bungie has a legitimate expectation that its players are playing the game

honestly, and tens of millions of *Destiny 2* players expect an honest, fair experience. Second, Claudiu-Florentin is engaging in a commercial enterprise by offering the Cheats for sale on the Website. Finally, Claudiu-Florentin's actions have caused injury to Bungie's business, including its revenue from *Destiny 2* and, more broadly, its reputation and community goodwill. Claudiu-Florentin's conduct also is unlawful, and "[w]hat is illegal and against public policy is per se an unfair trade practice." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash. 2d 778, 786, 719 P.2d 531 (Wash. 1986) (alteration in original) (citation omitted). Bungie therefore is entitled to default judgment on this claim as well.

### 3.   The Fourth *Eitel* Factor Favors Bungie Because Claudiu-Florentin's Conduct Warrants the Damages Bungie Seeks.

The fourth *Eitel* factor favors default judgment because the damages Bungie seeks are reasonable in light of Claudiu-Florentin's willful conduct in directing an illegal enterprise. Although courts are more cautious when large damage awards are involved, "the court must consider the amount of money at stake in relation to the seriousness of Defendant['s] conduct." *PepsiCo, Inc.,* 238 F. Supp. 2d at 1176. Here Claudiu-Florentin's willful conduct justifies the award of damages.

### 4.   The Fifth *Eitel* Factor Favors Bungie Because the Facts are Undisputed.

Finally, the fifth *Eitel* factor favors entry of default judgment as well. By consciously declining to participate in this litigation despite acknowledging service of process on two separate occasions, Claudiu-Florentin has admitted the scope and the extent of his participation in the illicit enterprise at the heart of this case. Because default has been entered, "the court must take plaintiff's factual allegations as true." *Curtis*, 33 F. Supp. 3d at 1212. In any event, Bungie has supported its claims with substantial evidence, indicating the material facts would not be disputed even if

Claudiu-Florentin had decided to appear. *See Landstar Ranger, Inc. v. Parth Enters., Inc.*, 725 F. Supp. 2d 916, 922 (C.D. Cal. 2010) (finding no possibility of factual dispute where plaintiff "supported its claims with ample evidence, and defendant has made no attempt to challenge the accuracy of the allegations in the complaint"). This factor, too, favors grant of Bungie's Motion.

> **D.    The Court Awards Bungie $146,662.28 in Actual Damages on Its Copyright Claim, $11,696,000 in Statutory Damages on its Circumvention Claims, and $217,250.70 in Attorney's Fees and Costs, Plus Fees and Costs Incurred After Submission of this Motion.**

The award Bungie seeks in this case is large because Claudiu-Florentin's willful unlawful conduct caused Bungie substantial harm under several applicable laws. This award is thus appropriate. As the Ninth Circuit has repeatedly held, when the applicable laws are enacted for different purposes and provide for different types of damages, there is no concern for double recovery. *See Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994) ("Congress created two separate statutory schemes to govern copyrights and trademarks; in order to effectuate the purposes of both statutes, damages may be awarded under both."); *Seattle Pac. Indus., Inc. v. S3 Holding LLC*, 831 F. App'x 814, 818 (9th Cir. 2020) (finding no error in "awarding both liquidated damages for breach of contract and actual damages for trademark infringement" because "the awards address separate conduct and separate injuries").

> **1.    The Court Awards Bungie $146,662.28 in Actual Damages on Its Copyright Claim.**

Under 17 U.S.C. 504(a), "an infringer of copyright is liable for either "the copyright owner's actual damages and any additional profits of the infringer" or statutory damages. "Actual damages" consist of "the actual damages suffered by [the plaintiff] as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual

damages." 17 U.S.C. § 504(b). "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.* "[T]he purpose of § 504(b) is to compensate fully a copyright owner for the misappropriated value of its property and 'to avoid unjust enrichment by defendants, who would otherwise benefit from this component of profit through their unlawful use of another's work." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 718 (9th Cir. 2004).

Pursuant to the Court's September 6, 2022, Order, Dkt. 31, Bungie conducted post-default discovery by serving a subpoena on Stripe, a payment processing company. In response to the subpoena, Stripe produced data on thousands of sales of Cheats, including 5,848 separate transactions identifying subscriptions for either a *Destiny 2* Cheat or a premium cheat product containing *Destiny 2* as an option. Between November 2020 and July 2022, Claudiu-Florentin and the other Defendants received approximately $146,662.28 for those transactions. Based on these transactions, the Court awards actual damages of $146,662.28.

This entire amount is recoverable here, as 17 U.S.C. § 504(a) places the burden firmly on Claudiu-Florentin to prove any deductions and apportion any profits not attributable to the inclusion of *Destiny 2*. *See* 17 U.S.C. § 504(b) ("[T]he infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.").

### 2.  The Court Awards Bungie $11,696,000 in Statutory Damages on Its Circumvention Claims.

A person engaging in circumvention in violation of 17 U.S.C. § 1201(a) is liable for either "the actual damages and any additional profits of the violator" or statutory damages. 17 U.S.C. § 1203(c)(1). A plaintiff electing to receive statutory damages is

entitled to "an award . . . for each violation of section 1201 in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just." 17 U.S.C. § 1203(c)(3). In awarding damages in this statutory range, courts consider factors including "profits reaped by defendant in connection with the infringement; revenues lost to the plaintiff; and the willfulness of the infringement" as well as "the goal of discouraging wrongful conduct." *Sony Comput. Ent. Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068, 1075 (N.D. Cal. 2005).

Here, Claudiu-Florentin's actions were so clearly willful and unlawful as to justify awarding $2,000 per each of the 5,848 Cheats documented in the Stripe production, for a total of $11,696,000. *See Philips N. Am. LLC v. KPI Healthcare, Inc.*, No. SACV 19-1765 JVS (JDEx), 2021 WL 6103527, at *1, *8 (N.D. Cal. Sept. 1, 2021) (where the defendant "hack[ed] into Philips's proprietary software in the ultrasound systems to modify, tamper with, and alter the systems to enable unlicensed software features," sold those "modified systems for a profit," and modified system identifiers to "hide their illegal conduct," finding these "acts of circumvention are severe" and awarding "$2,000 per device"). This is especially so in light of the fact that the number of unlawful transactions at issue, while large, does not fully account for the damages Bungie sustained as a result of Claudiu-Florentin's acts of circumvention.

Moreover, although Bungie is unable to precisely calculate the amount of this damage, it has spent more than $2,000,000 on cheat mitigation (including staffing and software) since November 2020, when Stripe recorded Claudiu-Florentin's first transaction involving a *Destiny 2* Cheat. In addition, the number of unique transactions in the Stripe production actually underestimates the extent of Claudiu-Florentin's participation in the VeteranCheats.com enterprise, as it does not include Claudiu-Florentin's own circumventions of account bans and his own repeated uses of the

Cheats. The 5,848 figure also does not include the thousands of acts of circumvention perpetrated by Claudiu-Florentin's customers each time they loaded the Cheats and used them to play *Destiny 2* for almost two years. *See Philips N. Am.*, 2021 WL 6103527, at *8 ("[I]t is clear that each modification of the systems' software to provide access to unlicensed software is a circumvention of technological measures."). Under these circumstances, an award of $11,696,000 in statutory damages is entirely appropriate..

### 3.      Bungie is Entitled to Recover its Attorney's Fees and Costs.

Section 505 of the Copyright Act gives this Court the discretion to award "full costs" as well as "a reasonable attorney's fee to the prevailing party as part of the costs," 17 U.S.C. § 505, as does the Washington Consumer Protection Act. *See* RCW 19.138.280 ("[A] person who is injured by a violation of this chapter may bring an action for recovery of actual damages, including court costs and attorneys' fees."). In determining whether to award attorneys' fees under Section 505, courts may consider such factors as "frivolousness, motivation, objective unreasonableness . . . and the need in particular circumstances to advance considerations of compensation and deterrence." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994); *see also Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 203 (2016) (instructing courts to give objective reasonableness "substantial" but not dispositive weight).

To date, Bungie has incurred $217,250.70 in attorney's fees and costs, all of which were incurred in the process of litigating this action, all of which it is entitled to recover, as well as additional fees incurred after the date of this Motion.

### E.      The Court Should Issue a Permanent Injunction.

The Copyright Act gives this Court the authority to "grant [a] . . . final injunction[] on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). The Digital Millennium Copyright Act also allows

courts to grant "permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation." 17 U.S.C. § 1203(b)(1). A permanent injunction is warranted where a plaintiff demonstrates that: (1) it has suffered irreparable injury; (2) monetary damages are inadequate to compensate for that injury; (3) the balance of hardships between the parties favors a remedy in equity; and (4) the public interest would not be disserved by entry of a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). All four factors are met here.

### 1.     Bungie Has Suffered Irreparable Harm.

As established by Bungie's Amended Complaint and supporting evidence, Claudiu-Florentin's unlawful activity has disrupted Bungie's business relationships, caused it to lose current and prospective customers, and damaged its brand and reputation. *See Getty Images (U.S.), Inc. v. Virtual Clinics*, No. C13–0626JLR, 2014 WL 1116775, at *6 (W.D. Wash. Mar. 20, 2014) ("[I]rreparable harm . . . may be shown where there is '[j]eopardy to a company's competitive position caused by copyright infringement,' or where there is 'the threat of the loss of prospective customers, goodwill, or reputation.'" (citation omitted)). That is because loss of prospective customers and goodwill cannot be easily reduced to a dollar figure. *See CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1080 (E.D. Cal. 2009) (copyright infringement may specifically constitute irreparable harm "in the loss of control of a business'[s] reputation" and in the "loss of trade and . . . goodwill"), *aff'd,* 348 F. App'x 288 (9th Cir. 2009); *eBay Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000) ("Harm resulting from lost profits and lost customer goodwill is irreparable because it is neither easily calculable, nor easily compensable and is therefore an appropriate basis for injunctive relief."). This factor therefore favors issuance of a permanent injunction.

1

**2.      Monetary Damages Alone Are an Inadequate Remedy.**

2

"[T]he requisite analysis for [this] factor . . . inevitably overlaps with that of the

3

first." *MercExchange L.L.C. v. eBay Inc.*, 500 F. Supp. 2d 556, 582 (E.D. Va. 2007).

4

That is, given the difficulty of calculating Bungie's lost sales and the harm to its

5

goodwill, an award of monetary damages alone would be inadequate to compensate the

6

injuries Claudiu-Florentin has caused Bungie.

7

A permanent injunction also may be necessary to put a stop to the infringing

8

conduct. Here, Claudiu-Florentin's refusal to participate in this case should "not

9

reassure the Court that [he] has stopped . . . infring[ing] Plaintiff['s] Work or will

10

voluntarily do so in the future." *Eve Nev., LLC v. Derbyshire*, No. 21-0251-LK, 2022

11

WL 279030, at *8 (W.D. Wash. Jan. 31, 2022); *see also Hunter Killer Prods., Inc. v.*

12

*Zarlish*, No. 19-00168-LEK-KJM, 2020 WL 3980117, at *5 (D. Haw. June 15, 2020),

13

(defendant's refusal to participate in the case provided "no reassurance that Defendant .

14

. . will stop making software applications available to the public through his website

15

infringing on Plaintiffs' copyrighted Works"), *report and recommendation adopted*, CV

16

19-00168 LEK-KJM, 2020 WL 3977607 (D. Haw. July 14, 2020); *Hearst Holdings,*

17

*Inc. v. Kim*, No. CV07-4642-GAF (JWJx), 2008 WL 11336137, at *7 (C.D. Cal. Aug.

18

17, 2008) (defendants' "failure to respond in any way to this action does not reassure

19

the Court that [they] have stopped infringing Plaintiffs' copyrights, which is yet another

20

reason why granting a permanent injunction to enjoin them from further infringement is

21

appropriate"). Thus, this factor also weighs in favor of a permanent injunction.

22

**3.      The Balance of Equities Strongly Favors a Permanent Injunction.**

23

Claudiu-Florentin has no legitimate interest in continuing to profit from his

24

exploitation and abuse of Bungie's work. "Since Defendant never had a right to do this

25

in the first place, [he] suffers no hardship by entry of a permanent injunction." *Eve Nev.*,

26

2022 WL 279030, at *9; *see Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003

n.12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.") By contrast, in the absence of a permanent injunction, Bungie will continue to suffer irreparable harm as a result of Claudiu-Florentin's willful misconduct. The balance of harms tips decidedly in Bungie's favor. *See Getty Images*, 2014 WL 1116775, at *7 ("Because there is no legitimate purpose for the Camps' infringement and there is a threat to Getty's business, the balance of hardships favors Getty.").

### 4.   The Public Interest Would Be Served by Entry of a Permanent Injunction.

Finally, "[c]ourts usually find that 'the public interest is . . . served when the rights of copyright holders are protected against acts likely constituting infringement.'" *Getty Images*, 2014 WL 1116775, at *7 (citation omitted). This is particularly true where, as here, a defendant engages in conduct that obviously threatens creative endeavor. As this Court held on analogous facts in *Eve Nevada*, "[p]irating and distributing dozens of copies of [a copyrighted] film—does not 'promote the Progress of Science and useful Arts,'" but is "the digital equivalent of standing outside the neighborhood Redbox—or Blockbuster Video, for fans of history—and giving away copies of the movie for free." *Eve Nev.*, 2022 WL 279030, at *9. Claudiu-Florentin's illicit enterprise, built on stealing, hacking, and profiting from cheaters, poses a similar threat to the public good.

In sum, all four *eBay* factors support the entry of permanent injunction against Claudiu-Florentin. Bungie has suffered irreparable injury and cannot be adequately compensated by monetary damages. No legitimate interest would be served by allowing Claudiu-Florentin to continue his unlawful behavior, while Bungie will suffer significant hardship in the absence of a permanent injunction. And the public interest

would be well served by stopping Claudiu-Florentin from "sneer[ing] in the face of copyright owners and copyright laws." *See Tu v. TAD Sys. Tech. Inc.*, No. 08-CV-3822(SLT)(RM), 2009 WL 2905780, at *6 (E.D.N.Y. Sept. 10, 2009) (citation and internal quotation marks omitted).

THEREFORE, pursuant to 17 U.S.C. §§ 501, 504, 505, 1201, and 1203, the Court enters judgment in the total amount of $12,059,912.98 as outlined above, and in addition, pursuant to 17 U.S.C. §§ 502 and 1203, and this Court's inherent equitable powers, the Court ORDERS as follows:

1.      Defendant, all persons acting under Defendant's direction or control (including but not limited to Defendant's agents, representatives, and employees), and those persons or companies in active concert or participation with Defendant who receive actual notice of this Order by personal service or otherwise, must immediately and permanently cease and desist from any of the following:

a.      Taking any steps on Defendant's own behalf or assisting others in creating, distributing, advertising, marketing or otherwise making available; obtaining, possessing, accessing or using; promoting, advertising, or encouraging or inducing others to purchase or use (including via any social media account, website, or video-sharing account); selling, reselling, or processing payments for; assisting in any way with the development of; sharing, copying, transferring, or distributing; publishing or distributing any source code or instructional material for the creation of; or operating, assisting, promoting or linking to any website designed to provide information to assist others in accessing, developing or obtaining: (i) cheat software designed for use in conjunction with the *Destiny 2* game or software; or (ii) any software whose use infringes intellectual property owned or controlled by Bungie or its parents, subsidiaries, or affiliates (collectively, "Bungie," for the purposes of this Order), circumvents technological

measures that effectively control access to Bungie's games, violates Bungie's licensing agreements, assists players of Bungie's games in violating Bungie's licensing agreements, or is designed to exploit or enable the exploitation of any game owned, published, distributed or operated by Bungie.

b.      Investing or holding any financial interest in any enterprise, product, or company which Defendant knows or has reason to know is now, or intends in the future to be, engaged in any of the foregoing activities prohibited by this Judgment and Permanent Injunction.

c.      Reverse engineering, decompiling, packet editing, or otherwise manipulating without authorization, any game owned, published, or operated by Bungie, or providing any assistance to any person or entity engaged in such activities.

2.      The Court further enjoins Defendant and any person or company in active concert or participation with Defendant who receives actual notice of this Order, including but not limited to any payment processors, domain name registrars, or registries holding or listing any of Defendant's websites or storefronts, from supporting or facilitating access to any and all domain names, URLs, and websites (including, but not limited to, www.veterancheats.com), including any and all future and successor domain names, URLs, and websites, through which Defendant traffics in circumvention devices that threaten Bungie's technological protection measures or infringe Bungie's intellectual property rights.

3.      Defendant and all persons or companies in active concert or participation with Defendant who receive actual notice of this Order are prohibited from using any social-network, video-sharing, or digital-messaging accounts under any of their control (including, but not limited to, Facebook, groups or chats on Facebook, YouTube, Twitter, Tik Tok, Discord, GBATemp, Reddit, Telegram, Skype, WeChat, WhatsApp,

Signal, or their equivalent) to provide any content relating to the distribution, marketing, offering for sale, or promotion of cheat software designed for use in conjunction with the *Destiny 2* game or software, or any other software whose use infringes any of Bungie's intellectual property Rights, circumvents Bungie's technological measures that effectively control access to Bungie's games, or violates (or assists players of Bungie's games in violating) Bungie's license agreements, and must take all necessary steps to remove any information on any non-dedicated (e.g., personal) social network accounts under any of their control used to distribute or promote any of the foregoing.

4. Defendant and all persons or companies in active concert or participation with Defendant who receive actual notice of this Order are further prohibited from engaging in any other violation of the Copyright Act or the Digital Millennium Copyright Act, or any other federal or state law, with respect to Bungie and its intellectual property.

5. Defendant and all persons or companies in active concert or participation with Defendant who receive actual notice of this Order will destroy all cheat software designed for use in conjunction with the *Destiny 2* game or software, or any software that in any way interacts with or pertains to Bungie's intellectual property.

6. This permanent injunction constitutes a binding court order, and any violations of this order by Defendant or any person or company in active concert or participation with Defendant who receives actual notice of this Order will subject them to the full scope of this Court's contempt authority, including punitive, coercive, and monetary sanctions.

7. Any company or entity that Defendant controls in the future will also comply with the provisions of this Judgment and Permanent Injunction.

8.      This permanent injunction is binding against Defendant and any person or company in active concert or participation with Defendant who receives actual notice of this Order worldwide, without regard to the territorial scope of the specific intellectual property rights asserted in the Complaint, and may be enforced in any court of competent jurisdiction wherever Defendant or such other person or any of their assets may be found.

9.      Nothing contained in this Judgment and Permanent Injunction limits Bungie's right to seek relief, including without limitation damages, for any infringements of any intellectual property rights occurring after the date of this Judgment and Permanent Injunction.

The Court finds there is no just reason for delay in entering this Judgment and Permanent Injunction and, pursuant to Federal Rule of Civil Procedure 54, the Court directs immediate entry of this Judgment and Permanent Injunction against Defendant Claudiu-Florentin.

DATED this_____day of_____, 2023.


_____
UNITED STATES MAGISTRATE JUDGE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Presented by,

**KILPATRICK TOWNSEND & STOCKTON LLP**

*/s/ Christopher Varas*

Christopher Varas (WA Bar No. 32875)
Kilpatrick Townsend & Stockton LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
Telephone: 206.516.3088
Facsimile: 206.623.6793
*cvaras@kilpatricktownsend.com*

*Admitted Pro Hac Vice*
Crystal Genteman
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
Telephone: 404.815.6500
*cgenteman@kilpatricktownsend.com*

*Attorneys for Plaintiff Bungie, Inc.*